## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE LEE, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CANADA GOOSE US, INC.,<br><br>Defendant. | Case No. 20-9809<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff George Lee ("Plaintiff" or "Lee"), individually and on behalf of other similarly situated individuals, by and through his counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendant Canada Goose US, Inc. ("Canada Goose" or "Defendant") regarding deceptive labeling representations related to the humane treatment of the coyotes used in its fur products (the "Products," as further defined below). Plaintiff Lee alleges the following based upon information, belief, and the investigation of his counsel:

## INTRODUCTION

1.      The accuracy of animal welfare claims is material to consumers, a majority of whom wish to avoid products of animal cruelty but lack technical knowledge regarding fur industry practices and the enforcement of animal welfare standards.

2.      As a result, demand has increased for clothing products that provide assurances about how they are produced and sourced, including fur products claiming to be ethically and sustainably sourced. Consumers, as Canada Goose knows, are willing to pay more for products labeled and marketed in this way than they are willing to pay for competing products that do not provide such assurances.

3.     Canada Goose produces, markets, and distributes clothing products, many of which contain fur trim. Defendant advertises and markets these products as being ethically and sustainably sourced in accordance with humane trapping standards. Canada Goose bolsters these representations with the claim that its fur suppliers are "strictly regulated by state, provincial and federal standards."

4.     Contrary to its representations, Canada Goose allows for the purchase of fur from trappers that operate in jurisdictions that have no laws or regulations regarding the methods of slaughtering trapped animals or the types of traps that may be used. In reality, Canada Goose's suppliers use cruel methods that cause strangulation and broken bones to coyotes and other animals who are inadvertently trapped and discarded. Reasonable consumers would not perceive these methods as "ethical," "sustainable," or "humane."

5.     In sum, Defendant is deceiving consumers into believing that the Products are ethically and sustainably sourced and that it requires "strictly regulated" humane trapping practices within its supply chain.

6.     No reasonable consumer who sees Canada Goose's representations would expect such sourcing to include trappers that use inhumane methods and that are not subject to any animal welfare regulations and/or enforcement.

7.     By deceiving consumers about the source of its Products, Canada Goose is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take market share away from competing products, thereby increasing its own sales and profits.

8.     Because Defendant's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, source, and traceability of the Products, Plaintiff Lee brings this deceptive advertising case on behalf of himself and all others similarly

situated, and seeks monetary and injunctive relief, including an order to halt Defendant's false marketing, labeling, and sale of the Products.

## FACT ALLEGATIONS

9.     Plaintiff Lee brings this suit against Canada Goose based on misrepresentations about the ethical, sustainable, and humane sourcing of its fur products from "strictly regulated" trappers, when in fact Canada Goose sources from trappers that use inhumane methods in jurisdictions with little or no fur-related animal welfare regulation or enforcement.

10.     Canada Goose's Product marketing and labeling representations are false and deceptive because they allow for the sourcing of fur from jurisdictions that have no regulations regarding the methods of slaughtering trapped animals or the types of traps that may be used, and because Canada Goose's suppliers' trapping methods are inhumane.

11.     Canada Goose knows that American consumers increasingly and consciously seek out and will pay more for ethical or sustainable clothing products that meet strict animal welfare standards.

12.     Accordingly, Canada Goose cultivates an image of the Products as a humane alternative for consumers who wish to avoid fur products that are sourced using inhumane, unsustainable, and unethical trapping practices.

**A. Canada Goose's Fur Suppliers are Not "Strictly Regulated"—They Operate in Jurisdictions that Have No Animal Welfare Regulations Regarding Fur Trapping and Slaughter Methods.**

13.     Canada Goose capitalizes on consumers' knowledge gap regarding fur industry practices by misrepresenting the treatment of the coyotes in its supply chain, including statements made on its Product labels that emphasize the company's "ethical, responsible, and sustainable

sourcing and use of real fur" and claim that its fur suppliers are "strictly regulated by state, provincial and federal standards."

**Figure 1:**



14.     Canada Goose makes specific representations about the "ethical" sourcing of its fur on a paper hang tag attached to the Products, which contains the following statements, as shown in Figure 1 above:

- *"The Canada Goose Fur Transparency Standard*™ is our commitment to support the ethical, responsible, and sustainable sourcing and use of real fur";

- The first traceability program to cover the wild habitat, it ensures that all fur sourced by Canada Goose is in accordance with the Agreement of International Humane Trapping Standards (AIHTS) in Canada and the Best Managed Practices (BMP) in the United States, and is fully traceable throughout the supply chain";

- "The standard certifies that we never purchase fur from fur farms, never use fur from endangered animals, and only purchase fur from licensed North American trappers strictly regulated by state, provincial and federal standards."

15.     Canada Goose's labeling representations regarding fur are designed to, and do, lead consumers to believe that Canada Goose fur suppliers are subject to strict regulations that prevent the infliction of extreme pain or distress on animals trapped for its fur products.

16.     While Canada Goose's public representations lead reasonable consumers to believe that the company exclusively uses fur from humanely treated and slaughtered animals, those with knowledge and information not readily available to average consumers can determine that Canada Goose allows for the purchase of fur from inhumane sources.

17.     In fact, Canada Goose allows for sourcing from trappers that operate in jurisdictions that have no regulations regarding the methods of slaughtering trapped animals or the types of traps that may be used.

18.     Canada Goose fails to prohibit the use of inhumane snares that cause death by strangulation and cruel leghold traps that have been banned in dozens of countries and several U.S.

states; these methods commonly result in leg fractures, tendon and ligament damage, lost claws, broken teeth, lacerations, dislocated joints, swelling, and prolonged psychological distress.[1]

19.     Canada Goose assures consumers that it ensures the ethical sourcing of fur by reference to its exclusive use of U.S. and Canadian trappers that are "strictly regulated by state, provincial, and federal standards."[2] However, there are no U.S. federal laws or regulations that require the humane treatment of coyotes trapped for fur.[3]

20.     Moreover, the Associate of Fish and Wildlife Agencies has reported that over 75% of U.S. states do not regulate slaughter methods in fur trapping at all and a majority of U.S. states do not prohibit any specific types of traps, no matter how cruel.[4] Canada Goose has provided no indication that furs from these states are prohibited from its supply chain.

21.     Furthermore, Canada Goose's statements that it only uses "licensed" fur trappers are designed to give consumers a sense of assurance about trappers' practices. In reality, according to the North American Fur Industry Communications group ("NAFIC"), such licensing is simply a matter of taking a training course on conservation and trapping systems, and then purchasing the license.[5]

22.     As to the actual administration of the animal welfare standards that exist in some jurisdictions, enforcement bodies struggle to fulfill their mandates. According to information obtained from the province of British Columbia by the Association for the Protection of Fur-

---

[1] *See e.g.,* John A. Shivik et al., *Initial Comparison: Jaws, Cables, and cage-traps to Capture Coyotes,* Nat'l Wildlife Research Ctr., 1379 (2005), https://naldc.nal.usda.gov/download/36306/PDF; *see also,* Graziella Iossa et al., *Mammal trapping: A review of animal welfare standards of killing and restraining traps,* Animal Welfare 16, 3 (Aug. 2007), https://www.researchgate.net/publication/228668169.
[2] *See* Figure 1, *supra.*
[3] *See* Dena M. Jones & Sheila Hughes Rodriguez, *Restricting the Use of Animal Traps in the United States: An Overview of Laws and Strategy,* 9 Animal Law 136, 151 (2003).
[4] *Id.*
[5] *How Fur is Produced: Trapping,* Truth About Fur, http:///www.truthaboutfur.com/en/becoming-a-trapper (last visited Nov. 19, 2020).

COMPLAINT

Bearing Animals ("APFBA"), as of 2013, the almost 950,000 square kilometers of British Columbia were covered by fewer than 90 British Columbia Conservation Officers, or one officer per 11,000 square kilometers.[6]

**B. Canada Goose's Claims About the "Ethical" and "Sustainable" Sourcing of Its Fur Products are False and Misleading Because Its Standards Are Insufficient to Ensure Humane Trapping Practices.**

23.    The paper hang tag attached to the Products states that Canada Goose *ensures* that all sourced fur complies with AIHTS and BMP standards. However, even if Canada Goose did ensure compliance with AIHTS and BMP standards, as Canada Goose suggests, its representations would still be misleading, as these standards themselves authorize inhumane trapping practices that reasonable consumers would perceive as neglectful and unduly harmful—not as "ethical," "sustainable," or "humane."

24.    The specific language of AIHTS, which applies to Canadian trapping, explicitly allows for up to 20% of animals tested in traps to demonstrate both physical and behavioral indicators of poor welfare—*i.e.*, pain, injury, or suffering.[7] In the United States, the voluntary BMP guidelines allow for up to 30% of animals to be subjected to similar cruelty and suffering.[8]

25.    Furthermore, both the AIHTS and the BMP allow for the use of leg-hold traps (see Figure 2 below) that are considered inhumane and have been banned in 57 countries.[9] Multiple

---

[6] *Screenshot of The Association for the Protection of Fur-Bearing Animals Website from Jan. 13, 2019*, WaybackMachine, https://web.archive.org/web/20190113221052/http://thefurbearers.com/the-issues/trapping/what-is-wrong-with-trapping.

[7] *Agreement on international humane trapping standards between the European Community, Canada, and the Russian Federation (AIHTS)*, Official J. of the European Cmty. §§ 2.3.1 – 2.3.2, 2.4, https://fur.ca/wp-content/uploads/2015/09/AIHTS-Copy-of-Agreement.pdf (last visited Nov. 19, 2020).

[8] *Michigan Trapper Education Manual: A Guide for Trappers in Michigan*, Mich. Dep't of Natural Res., 44-47, https://www.michigan.gov/documents/dnr/MI_Trapper_Education_Manual_82307_206561_7.pdf (last visited Nov. 19, 2020).

[9] *Laws on Leg-Hold Animal Traps Around the World*, The Law Library of Congress Global Legal Research Ctr. (Aug. 2016), https://www.loc.gov/law/help/leg-hold-traps/leg-hold-traps.pdf.

U.S. states have also banned leghold traps for recreational or commercial purposes, including California, Colorado, Florida, Massachusetts, New Jersey, Rhode Island, and Washington.[10] Major veterinary associations, including the American Animal Hospital Association[11] and the American Veterinary Medical Association,[12] oppose the use of leg-hold traps that are permitted under Canada Goose's standard. The National Animal Care & Control association "strongly opposes the use of traps that capture the animal by the leg" noting that "leg hold traps … can cause significant harm and even death to an animal in a cruel and inhumane manner."[13]

**Figure 2:**



[14]

---

[10] *2017 Trapping Report,* Born Free USA, (Sept. 21, 2017), https://a9354ca433cea7ae96304b2a57fdc8a0.ssl.cf1.rackcdn.com/BornFreeUSA-2017-Trapping-Report-f.pdf.

[11] *Position Statements and Endorsements: Leghold Traps,* Am. Animal Hosp. Ass'n, https://www.aaha.org/about-aaha/aaha-position-statements/leghold-traps/ (last visited Nov. 19, 2020).

[12] *AVMA Policies: Trapping and Steel-jawed Leghold Traps,* Am. Veterinary Med. Ass'n, https://www.avma.org/KB/Policies/Pages/Trapping-and-Steel-jawed-Leghold-Traps.aspx (last visited Nov. 19, 2020).

[13] *NACA Guidelines,* Nat'l Animal Care & Control Ass'n, 7 (Sept. 3, 2014), https://cdn.ymaws.com/nacanet.site-ym.com/resource/resmgr/Docs/NACA_Guidelines.pdf.

[14] *Learn to trap coyotes March 30, 31,* Carolina Sportsman, https://www.carolinasportsman.com/hunting/other-hunting/learn-to-trap-coyotes-march-30-31/ (last visited Nov. 19, 2020).

COMPLAINT

26.     Even if all the trappers in Canada Goose's supply chain exceed the AIHTS and BMP standards by solely using padded or offset leghold traps, the fur used in Canada Goose products could not reasonably be considered "ethical" or "sustainable."[15] Both padded and offset leghold traps are banned for fur trapping in countless jurisdictions (as set forth above) because they, too, cause severe distress and injuries to animals. For example, one study conducted by the USDA APHIS National Wildlife Research Center ("NWRC") found that the use of padded leghold traps on coyotes resulted in bone fractures in 15-25% of trapped coyotes, and found tendon and ligament damage in up to 20% of cases.[16] Another NWRC study found that only four percent of coyotes caught in padded leghold traps suffered no injury, and recorded injuries included lost claws, severely broken teeth (likely from desperate attempts to bite off the traps), lacerations, dislocated joints, swelling, and "severe joint hemorrhage."[17]

27.     Other peer-reviewed studies have demonstrated that animals experience prolonged psychological distress when trapped, even in the absence of major physical injuries.[18] These studies have documented how psychological distress and physical injuries characterized as "minor" (*e.g.,* lost claws) can actually have lethal long-term effects for non-target animals who are released after trapping. Nevertheless, these cruel traps are widely used in the U.S. and Canada, including by trappers who abide by the standards cited by Canada Goose.[19]

28.     Coyotes are also captured and killed with snares—metal nooses designed to tighten around a coyote's neck and kill the animal by strangulation. Killing snares are considered

---

[15] *See Certified Traps – AIHTS Implementation in Canada*, Fur Inst. Of Can. (Aug. 1, 2018), https://fur.ca/wp-content/uploads/2020/01/Certified-Traps-List-FIC-Aout-1-2019-Eng-8-X-14-MOD.pdf (stating that the use of AIHTS certified offset and padded traps is "not yet mandatory").

[16] Glen H. Olsen, *Injuries to Coyotes in Padded and Unpadded Steel Foothold Traps,* Nat'l Wildlife Research Ctr., 219-223 (1986), https://nwrc.contentdm.oclc.org/digital/api/collection/p16473coll8/id/31858/download.

[17] *See supra* note 1.

[18] *Id.*

[19] *Id.*

inhumane by wildlife biologists, veterinarians, and animal welfare experts, and have been banned in several countries, including the U.K., and in multiple U.S. states.[20] Snares are still used, however, in all Canadian provinces and across the U.S.

29.     Although the AIHTS is silent on snares, it does require that for coyotes, devices designed to kill must render the animal irreversibly unconscious within 300 seconds, which means coyotes could be left to suffer, fully conscious and struggling for breath, for up to five minutes.[21] Even under the extremely low AIHTS standard for killing devices, snares fall short. A 2015 review of scientific information related to the humaneness of killing neck snares used to capture coyotes concluded that all neck snares studied were inadequate to consistently render canids unconscious.[22] In a study by the Federal Provincial Committee for Humane Trapping ("FPCHT"), researchers found that many canids were still alive when found—some more than 12 hours after being snared—and that in most cases, the animals did not die within 300 seconds.[23] Another test with canids noted the difficulty of consistently capturing animals around the neck, and found that only two out of seven animals tested lost consciousness within 300 seconds.[24]

30.     Coyotes caught in killing neck snares who do not die are reported to suffer painful injuries that are similar to or worse than those suffered by coyotes caught in leghold traps.[25] Coyotes may chew through the snare cable if the device does not tighten sufficiently to cause

---

[20] Born Free USA, *supra* note 10.

[21] *See supra* note 7.

[22] Gilbert Proulx et al., *Humaneness and Selectivity of Killing Neck Snares Used to Capture Canids in Canada: A Review,* Can. Wildlife Biology & Mgmt. *4,* 55 - 65 (Jan. 2015), https://www.researchgate.net/publication/272151929.

[23] Federal-Provincial Committee for Humane Trapping, *Report of the Federal Provincial Committee for Humane Trapping,* Fed.-Provincial Wildlife Conference, Can. Wildlife Serv. (1981).

[24] Gilbert Proulx et al., *Assessment of Power Snares to Effectively Kill Red Fox,* Wildlife Soc'y Bulletin 18, 27-30 (Spring 1990), http://www.jstor.org/stable/3782303?origin=JSTOR-pdf.

[25] Gilbert Proulx & Dwight Rodtka, *Steel-Jawed Leghold Traps and Killing Neck Snares: Similar Injuries Command Change to Agreement on International Humane Trapping Standards.* J. of Applied Animal Welfare Sci. 20(2), (Feb. 2017), https://www.ncbi.nlm.nih.gov/pubmed/28375756.

death, or if they are snared on another body part. There are multiple reports of escaped canids sighted with tightened snare loops around their necks and other limbs.[26]

31.     The troubling injuries documented of coyotes caught in snares but not killed are compounded by the fact that killing devices may be left unchecked for days or even weeks at a time, leaving injured animals to suffer and die slowly from injuries, exposure, exhaustion, dehydration, or starvation. Killing snares may be left unchecked for up to 72 hours in Saskatchewan (depending on proximity to urban areas),[27] and 14 days in British Columbia;[28] in Alberta and Quebec, there are no legally required checking times for killing snare devices.

32.     Moreover, in multiple studies on the use of leghold traps and snares, animals other than coyotes have been caught, including not only wild animals but also pets, with up to 67% of animals caught not being the target species.[29] Thus, trapping methods used by Canada Goose suppliers cause completely unnecessary suffering and death for countless animals and are not "ethical" or "sustainable."

33.     Canada Goose knows that American consumers increasingly and consciously seek out, and will pay more for, animal products marketed as "ethically" and "sustainably" sourced. Canada Goose capitalizes on consumers' knowledge gap regarding fur industry practices by misrepresenting the treatment of the coyotes in its supply chain, including statements made on its Product labels emphasizing the company's "ethical, responsible, and sustainable sourcing and use of real fur" and claims that its fur suppliers are "strictly regulated by state, provincial and federal

---

[26] Proulx et al., *supra* note 24.
[27] The Wildlife Regulations, W-13.1 RRS § 24(3) (1981).
[28] Wildlife Act Commercial Activities Regulation, 338/82 BC Reg, § 3.05(1)(c) (1982).
[29] *Welfare Implications of Leghold Trap Use in Conservation and Research*, Am. Veterinary Med. Ass'n (Apr. 30, 2008), https://www.avma.org/resources-tools/literature-reviews/welfare-implications-leghold-trap-use-conservation-and-research.

standards."

34.     In sum, Defendant is making representations about its fur trapping supply chain that are designed to sell apparel but do not match actual practice.

**C. Canada Goose's Claims are Material and Misleading to Consumers.**

35.     Canada Goose's representations are false and materially misleading to consumers.

36.     Canada Goose itself acknowledges that "[t]oday's consumers want to know more about the sustainability of fur and animal welfare and demand more transparency to make informed purchasing decisions."[30]

37.     Market surveys consistently demonstrate significant consumer concern about the treatment of animals used in consumer products.[31]

38.     For example, one survey demonstrated that over 75% of consumers were willing to pay more for animal products from humanely treated animals.[32]

---

[30] *Sustainably Sourced*, Canada Goose, https://www.canadagoose.com/us/en/sustainability/how/sustainably-sourced.html (last visited Nov. 19, 2020).

[31] The Hartman Grp., *Animal Welfare: Consumers Want Transparency*, Forbes (Sept. 11, 2015, 4:13 PM), https://www.forbes.com/sites/thehartmangroup/2015/09/11/animal-welfare-consumers-want-transparency/?sh=239edef2169d.; furfashion, *FUR TODAY, LEATHER TOMORROW? FASHION'S UNNATURAL SELECTION*, Fur & Fashion (Nov. 22, 2019), https://www.wearefur.com/fur-today-leather-tomorrow-fashions-unnatural-selection/ ("The BFTA also found people aged 18-24 are more likely to buy natural fur if it comes from ethical sources compared to all other age groups."); *Consumer Perceptions of Farm Animal Welfare*, Animal Welfare Inst., https://awionline.org/sites/default/files/uploads/documents/fa-consumer_perceptionsoffarmwelfare_-112511.pdf (last visited Nov. 19, 2020); *see also* Sarah Schmidt, *Animal Welfare an Increasing Concern for Consumers*, Mkt. Research (Apr. 26, 2017), https://blog.marketresearch.com/animal-welfare-an-increasing-concern-for-consumers; *see also* Mario Abad, *The 3 Reasons Several Luxury Brands are Saying No to Real Fur*, Forbes (Mar. 27, 2018, 4:47 PM), https://www.forbes.com/sites/marioabad/2018/03/27/sustainable-luxury-brands-anti-fur-faux-fashion/#2680bced6177.

[32] Consumer Reports National Research Center, *Natural Food Labels Survey* 4 (2015); American Humane Association, *Humane Heartland Farm Animal Welfare Survey* 6, 10 (2013), https://www.americanhumane.org/app/uploads/2013/08/humane-heartland-farm-animals-survey-results.pdf; *Consumer Perceptions of Farm Animal Welfare* 9-10, Animal Welfare Institute (Feb. 2019), https://awionline.org/sites/default/files/uploads/documents/fa-consumer_perceptionsoffarmwelfare_-112511.pdf; *Survey shows U.S. chicken consumption remains strong*, Refrigerated & Frozen Foods (July 24, 2018), https://www.refrigeratedfrozenfood.com/articles/95292-survey-shows-us-chicken-consumption-remains-strong; Am. Humane Certified, *2014 Humane Heartland Farm Animal Welfare Survey* 3, (2014), https://www.americanhumane.org/app/uploads/2016/08/2014-humane-heartland-farm-survey.pdf; C. Victor Spain et

39.     Surveys have also specifically demonstrated that animal welfare is one of the most important factors in whether animal products are considered by consumers to be "ethically produced."[33]

40.     The Federal Trade Commission ("FTC") has acknowledged that the term "sustainable" can be "interpreted to imply certain specific environmental benefits" and has "admonished" companies not to use unqualified claims such as "sustainable," due to the FTC's determination that it is "highly unlikely that they can substantiate all reasonable interpretations of these claims."[34]

41.     Consumer perception research further demonstrates that general sustainability claims such as "sustainably produced" are perceived by consumers as "umbrella terms" that convey numerous materially beneficial attributes such as "produced according to higher animal welfare standards."[35]

42.     Consumer perception studies have further found that consumers believe the methods used by Canada Goose's suppliers are inhumane.

al., *Are They Buying It? United States Consumers' Changing Attitudes toward More Humanely Raised Meat, Eggs, and Dairy*, 8 Animals J. 128 (2018).

[33] *See e.g.*, *Ethical Food: A Research Report On The Ethical Claims That Matter Most To Food Shoppers And How Ethical Concerns Influence Food Purchases*, Context Marketing (Mar. 2010), https://faunalytics.org/wp-content/uploads/2015/05/Citation1307.pdf; *see also 74% OF CONSUMERS LIST ANIMAL WELFARE AMONG THE TOP FACTORS WHICH MAKE A FOOD BRAND ETHICAL*, Mintel (July 28, 2015), https://www.mintel.com/press-centre/food-and-drink/74-of-consumers-list-animal-welfare-among-the-top-factors-which-make-a-food-brand-ethical ("[T]hree quarters (74%) [of consumers] say that meat coming from animals which are looked after well is among the top issues that make a food company ethical."). Additionally, the National Advertising Division of the Better Business Bureau has found that "ethically raised" claims are deceptive when the treatment of animals used in the marketed products does not exceed industry standards. *Animal Welfare Institute v. Clemens Food Group, LLC*, NAD 6305: Hatfield Pork Products (Aug. 19, 2019).

[34] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, Federal Trade Commission (Apr. 2, 2019), https://www.ftc.gov/news-events/press-releases/2019/03/ftc-sends-warning-letters-companies-regarding-diamond-ad.

[35] Katrin Zander & Yvonne Feucht, *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe*, 30 J. Int'l Food & Agribusiness Marketing 251 (Dec. 22, 2017).

43.     For example, one consumer perception study conducted for the International Association of Fish and Wildlife Agencies found that "in all of the focus groups, the general sense" was that "leg-hold and foothold traps, the most widely identified traps, were inhumane."[36]

**D. Canada Goose Has Knowledge of Its Supply Chain and Is Aware That Its Representations Are False.**

44.     Canada Goose knows what representations it makes regarding the Products.

45.     The sources of the fur used in its Products and the trapping methods utilized by its suppliers are known to Canada Goose.

46.     Consumers frequently rely on manufacturers, their reputation, and the information provided on manufacturers' websites in making purchasing decisions.

47.     Reasonable consumers lack the information and scientific knowledge necessary to ascertain the true source, quality, and nature of the ingredients in the Products.

48.     Reasonable consumers must, and do, rely on Canada Goose to honestly report what the Products contain and how they are made.

49.     Reasonable consumers are misled and deceived by Canada Goose to believe that they are purchasing products that meet strict animal welfare standards.

50.     Canada Goose made these false, misleading, and deceptive representations, and omitted the information that would counter them, knowing that consumers would rely upon the representations in purchasing the Products.

51.     In making the false, misleading, and deceptive representations at issue, Canada Goose intended for consumers to purchase the Products when consumers might otherwise purchase competing products.

---

[36] *Attitudes Toward and Awareness of Trapping Issues In Connecticut, Indiana and Wisconsin*, Responsive Management (May 2001), https://www.fishwildlife.org/download_file/view/1057/1213.

52.     In making the false, misleading, and deceptive representations at issue, Canada Goose also knew and intended that consumers would pay more for animal products that were represented as "ethical" and "sustainable," furthering Canada Goose's private interest of increasing sales of its products and decreasing the sales of products that fit consumers' understanding of ethically sourced products that are truthfully marketed by its competitors.

53.     Canada Goose has profited enormously from consumers across the United States based on its falsely marketed products and its carefully orchestrated image.

54.     The highly successful marketing of Canada Goose jackets—which commonly retail for over $1,000 each—is widely recognized as the driving force behind the major increase in the global demand for coyote fur since 2013.[37]

55.     Canada Goose deceived and/or is likely to deceive the public by representing the Products as being "ethical" and "sustainable," and by claiming that animal welfare is strictly regulated within its supply chain.

56.     Consumers cannot discover the true nature of the Products by reading Canada Goose's labeling representations. Signage at the point of sale and Canada Goose's website do not state anywhere that the Products may contain fur from animals subject to unregulated trapping practices that are inhumane and unsustainable.

57.     Discovery of the true source of fur in the Products requires knowledge that is not available to the average reasonable consumer.

---

[37] *See Coyote fur is in big demand thanks to popular parkas,* CNBC (Feb. 28, 2019, 10:33 AM), https://www.cnbc.com/2019/02/28/coyote-fur-is-in-big-demand-thanks-to-popular-parkas.html; Michael Hill, *All those fur-trimmed Canada Goose coats: Bad news for coyotes, big money for trappers,* Chicago Tribune (Feb. 28, 2019, 8:35 AM), https://www.chicagotribune.com/business/ct-biz-canada-goose-coyote-fur-20190228-story.html.

58.     The supply chain and production process Canada Goose uses for the Products is known to Canada Goose and its suppliers but has not been disclosed to Plaintiff Lee or other consumers, despite Canada Goose's claims regarding its commitment to transparency.

59.     To this day, Canada Goose continues to conceal and suppress the true nature, identity, source, and method of production of the fur used in its Products.

60.     Canada Goose's concealment tolls the applicable statute of limitations.

61.     Upon information and belief, Canada Goose has failed to remedy the problems with the Products, continues to falsely represent that the products are "ethically" and "sustainably" sourced and that humane trapping practice standards are enforced within Canada Goose's supply chain, thus causing future harm to consumers.

62.     Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold as is, represented as "ethical" and "sustainable" and sourced from "strictly regulated" trappers.

63.     Defendant has failed to provide adequate relief to purchasers as of the filing of this complaint.

64.     Plaintiff Lee contends that the Products were sold pursuant to unfair and unconscionable trade practices, because the sale of the Products offends public policy and is immoral, unethical, oppressive, unscrupulous, and caused substantial economic injuries to consumers.

65.     Defendant's statements and other representations convey a series of express and implied claims and/or omissions that Defendants knows is material to the reasonable consumer in making a purchasing decision, and that Defendant intended for consumers to rely upon when choosing to purchase the Products.

66.     Accordingly, Plaintiff Lee seeks declaratory relief in the form of an order declaring Defendant's conduct to be unlawful, as well as injunctive relief putting an end to Defendant's misleading and unfair business practices, including a change to the current Products' representations, packaging, labels and marketing of the fur Products so that they are no longer represented as "ethical" and "sustainable" and subject to strict animal welfare regulations.

## JURISDICTION AND VENUE

67.     This Court has personal jurisdiction over the Defendant.

68.     The principal place of business of Defendant Canada Goose US, Inc. is in New York City, where Canada Goose maintains its sole U.S. office space.

69.     Furthermore, Defendant regularly conducts and transacts business in New York, purposefully avails itself of the laws of New York, markets its Products to consumers in New York, and distributes its Products to numerous retailers throughout the United States, including in New York. Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading labeling and advertising regarding the nature and quality of the Products and sales of the Products at issue, occurred within this District.

70.     Plaintiff Lee is a citizen of California and consents to this Court's jurisdiction.

71.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act, explicitly provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class comprises at least 100 members, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff Lee alleges that the total claims of

individual members of the proposed Class (as defined herein) exceed $5,000,000.00 in the aggregate, exclusive of interest and costs.

72.     Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature and/or quality of the Products, occurred within this District.

## **PARTIES**

73.     Plaintiff George Lee is an individual consumer who is a currently a citizen of Alameda County, California.

74.     During the class period, in November of 2017, Plaintiff Lee purchased a large, black Canada Goose Chateau Parka with coyote fur trim from a Tuckernuck store located at 1053 Wisconsin Avenue, Washington, D.C. 20007. Plaintiff Lee was a resident of Maryland at the time of purchase.

75.     Plaintiff Lee, when he entered the Canada Goose authorized retail outlet, saw and believed the paper hang-tag label representing that all fur included in the Product was "ethical," "sustainable," and sourced from "strictly regulated" trappers in accordance with "humane" trapping standards. These representations were material to Plaintiff Lee and encouraged him to make his purchase. Plaintiff Lee relied upon these representations, which as a consumer he had no reason to doubt.

76.     Plaintiff Lee would not have purchased the Product if he had known that, contrary to Canada Goose's representations, the Product included fur from suppliers permitted to engage in inhumane and unsustainable trapping practices. Having encountered, and believed, Canada Goose's representations that all of the Product's fur was "ethical" and "sustainable" and that humane trapping practice standards are "strictly regulated" within Canada Goose's supply chain,

Plaintiff Lee neither expected nor anticipated the Product he purchased would contain fur from suppliers in jurisdictions without regulations governing the slaughter of animals trapped for fur or the trapping practices used, nor did he expect or anticipate that Canada Goose's standards for sourcing fur, even if strictly adhered to, permit trapping practices that, to a reasonable consumer, would constitute undue harm and neglect.

77.     Having access to honest information is important to Plaintiff Lee. Plaintiff Lee would like to be able to purchase clothing items that comport with strict animal welfare and ethical sourcing representations and to inform his peers of the same. Unfortunately, at this time, because Canada Goose continues to market its fur products as "ethical" and "sustainable" and continues to claim that humane trapping practice standards are enforced within Canada Goose's supply chain, he is unable to make these purchases or to help his peers make purchasing decisions.

78.     Upon information and belief, Defendant Canada Goose US, Inc. maintains its U.S. headquarters in New York City and is responsible for the sale and marketing of the Products in the U.S.[38]

79.     At all times mentioned herein, Defendant was and is engaged in commercial transactions in New York, the District of Columbia, and throughout the United States.

80.     Defendant manufactures and/or causes the manufacture of the Products and markets and distributes the Products in retail outlets in New York and throughout the United States.

## CLASS ALLEGATIONS

81.     Plaintiff Lee brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated individuals nationwide (the

---

[38] *CANADA GOOSE US, INC.*, opencorporates, https://opencorporates.com/companies/us_vt/0307690 (last visited Nov. 20, 2020).

"Class"), defined as follows:

> All consumers who purchased the Products within the United States during the statute of limitations period and until the date of class certification.

82.     Included in the Class, to the extent necessary, is a subclass of all persons who purchased Canada Goose's Products (as defined herein) within the District of Columbia during the Class Period (the "D.C. Subclass").

83.     Excluded from the Class are (1) Defendant, any entity or division in which Defendant has a controlling interest, and Defendant's legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

84.     There are substantial questions of law and fact common to all members of the Class which will predominate over any individual issues. These common questions of law and fact include, without limitation:

> (a)     Whether Defendant is responsible for the labeling and advertising at issue;
>
> (b)     Whether the labeling and advertising of the Products was unfair, false, deceptive, fraudulent and/or unlawful;
>
> (c)     Whether Canada Goose breached a warranty created through the labeling and marketing of its Products; and
>
> (d)     Whether Canada Goose's conduct as set forth above injured, and may continue to injure, Plaintiff and Class members.

85.     Plaintiff Lee's claims are typical of the claims of the Class. Plaintiff Lee is a member of a well-defined class of similarly situated persons, and the members of the Class were similarly affected by Defendant's conduct and are owed the same relief, as alleged in this Complaint. Members of the Class are ascertainable from Plaintiff Lee's description of the class, Defendant's records, and records of third parties accessible through discovery.

86.     Plaintiff Lee will fairly and adequately protect the interests of the Class and has no interests which are antagonistic to the claims of the Class. Plaintiff Lee will vigorously pursue the claims of the Class.

87.     Plaintiff Lee has retained counsel who are competent and experienced in consumer protection litigation, including class actions relating to false advertising. Plaintiff Lee's counsel have successfully represented plaintiffs in complex class actions and currently represent other plaintiffs in several similar complex class action litigations involving false advertising.

88.     A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of Plaintiff Lee and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually, and the disposition of this case and as part of a single class action lawsuit will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Lee's and the Class members' claims together is manageable. Unless the Class is certified, Defendant will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

90.     No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

91.     The prerequisites to maintaining a class action for injunctive or equitable relief are met, as Defendant, by representing that all of the fur products sold by Canada Goose are "ethical" and "sustainable" and that Canada Goose's suppliers are "strictly regulated," despite Defendant's failure to prohibit unethical, unsustainable, and inhumane trapping practices within its supply chain, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

92.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class members are not parties to such actions.

93.     Defendant's conduct is generally applicable to the Class as a whole, and Plaintiff Lee seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's systematic policies and practices make declaratory relief appropriate with respect to the Class as a whole.

94.     Plaintiff Lee knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance of a class action.

## CAUSES OF ACTION

### COUNT I

**Violations of the District of Columbia Consumer Protection
Procedures Act ("DC CPPA")
(on Behalf of Plaintiff and the D.C. Subclass)**

95.     Plaintiff Lee incorporates by reference and realleges herein all paragraphs alleged above.

96.     Canada Goose is a "person" and a merchant that provides "goods" within the meaning of the DC CPPA. *See id.* § 28-3901(a)(1), (3), (7).

97.     Canada Goose has falsely and deceptively advertised and marketed the Products as "ethical" and "sustainable" and sourced from "strictly regulated" fur trappers. In fact, Canada Goose's Products are sourced from trappers that use inhumane methods in jurisdictions with little or no fur-related animal welfare regulation or enforcement

98.     Thus, Canada Goose has violated the DC CPPA by "represent[ing] that goods . . . have a source . . . [or] characteristics . . . that they do not have"; "represent[ing] that goods . . . are of a particular standard, quality, grade, style, or model, if in fact they are of another"; "misrepresent[ing] as to a material fact which has a tendency to mislead"; "fail[ing] to state a material fact if such failure tends to mislead"; "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead"; and "advertis[ing] . . . goods . . . without the intent to sell them as advertised." *See id.* § 28-3904(a), (d), (e), (f), (f-1), (h).

99.     Plaintiff and the members of the D.C. Subclass therefore have been injured and have suffered damages in an amount to be proven at trial, including treble damages or $1,500 per violation, whichever is greater. *Id.* § 28-3905(k)(2)(A)(i).

## COUNT II

### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff and all Class Members)

100.    Plaintiff Lee incorporates by reference and realleges herein all paragraphs alleged above.

101.    Plaintiff incorporates by reference and reallege herein all paragraphs alleged above.

102.    Defendant's unfair, false, misleading, and fraudulent practices in marketing the

Products, as alleged herein, violate each of the following state consumer protection statutes to the extent that Defendant's Products have been marketed in, and purchased by Class members in the respective state: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); §13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

103.    On September 28, 2020 and September 30, 2020, letters were sent on behalf of Plaintiff to Defendant via certified mail that provided notice of Defendant's violation of the state

consumer protection statutes[39] set forth above and demanded that within thirty (30) days from those dates, Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letters also stated that if Defendant refused to do so, a complaint seeking damages would be filed. Defendant received the letters on behalf of Plaintiff on October 5, 2020 and October 19, 2020, but it has failed to comply with the letters. Accordingly, Plaintiff, on behalf of himself and all other members of the Classes, seeks compensatory damages, punitive damages, injunctive relief, and restitution of any ill-gotten gains due to Defendant's acts and practices.

104.    Defendant violated these statutes by falsely and deceptively labeling the Products as "ethical" and "sustainable" and as sourced from "strictly regulated" fur trappers and by omitting material facts.

105.    Defendant's deceptive labeling was material to Plaintiff's and Class members' decisions to purchase the Products, to purchase as much of them as they did, and to pay the requested price.

106.    Defendant acted willfully, wantonly, and with reckless disregard for the truth.

107.    Plaintiff and the Class members have been injured in that they purchased the Products, paid the requested price, and received less than what they bargained and/or paid for.

108.    Plaintiff and Class members are entitled to recover compensatory damages, restitution, punitive and special damages, treble damages, attorneys' fees and costs, and other appropriate injunctive and declaratory relief.

---

[39] These letters further provided notice regarding Defendant's breach of express warranty and unjust enrichment under the common law of the states where the products are sold.

## COUNT III

**Breach of Express Warranty
(on Behalf of Plaintiff and all Class Members)**

109.    Plaintiff Lee incorporates by reference and realleges herein all paragraphs alleged above.

110.    Defendant provided Plaintiff and other members of the Class with a written, express warranty that the Products were "ethical" and "sustainable" and sourced from "strictly regulated" fur trappers.

111.    These affirmations of fact or promises by Canada Goose relate to the goods and became part of the basis of the bargain.

112.    Plaintiff and members of the Class purchased Canada Goose's Products believing them to conform to the express warranties.

113.    Canada Goose breached these warranties, resulting in damages to Plaintiff and other members of the Class, who bought Canada Goose's Products but did not receive the goods as warranted.

114.    As a proximate result of the breach of warranties by Defendant, Plaintiff and the other members of the Class did not receive goods as warranted. Moreover, had Plaintiff and the Class members known the true facts, they would not have purchased Canada Goose's Products, or would have purchased Canada Goose's Products on different terms, or would have purchased fewer of Canada Goose's Products.

115.    Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.

## COUNT IV

### Unjust Enrichment
### (In the alternative, on Behalf of Plaintiff and all Class Members)

116.    Plaintiff Lee incorporates by reference and realleges herein all paragraphs alleged above.

117.    As the intended, direct, and proximate result of Defendant's conduct, Defendant has been unjustly enriched through sales of Canada Goose's Products at the expense of Plaintiff and the Class members.

118.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiff and the Class members, in light of the fact that the Products they purchased were not what Defendant represented them to be.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Lee respectfully requests that the Court enter judgment in his favor and in favor of the Class as follows:

A.    An order certifying the proposed Class and Subclass; appointing Plaintiff Lee as representative of the Class and Subclass; and appointing Plaintiff Lee's undersigned counsel as class counsel for the Class and Subclass;

B.    A declaration that Defendant is financially responsible for notifying Class members of the pendency of this suit;

C.    An order requiring proper, complete, and accurate representation, packaging, and labeling of the Products;

D.    An order enjoining Defendant's unlawful and deceptive acts and practices and requiring that Defendant remove and refrain from making representations on the Products' packaging, labeling, or elsewhere that the Products are ethically sourced and that humane trapping practice standards are enforced within Canada Goose's supply chain;

E.      Monetary damages, injunctive relief, and statutory damages in the maximum amount provided by law, including monetary damages for Plaintiff and members of the D.C. Subclass pursuant to D.C. Code § 28-3905(k)(2)(A)(i);

F.      Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An order awarding Plaintiff Lee and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

H.      Any further relief that the Court may deem appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff Lee hereby demands a trial by jury.


DATED: November 20, 2020

                          **RICHMAN LAW GROUP**

                          _____
                          Kim E. Richman
                          Jay Shooster
                          1 Bridge Street, Suite 83
                          Irvington, NY 10533
                          (718) 705-4579 (phone)
                          (718) 228-8522 (fax)
                          krichman@richmanlawgroup.com
                          jshooster@richmanlawgroup.com

                          *Counsel for Plaintiff*